**UNITED STATES,**

v.

**Ronell WILSON, et al., Defendants.**

**No. 04–CR–01016 (NGG).**

United States District Court,
E.D. New York.

Feb. 8, 2005.

Ephraim Savitt, Kelley J. Sharkey, Mitchell Dinnerstein, Captial Defender Office, Anthony L. Ricco, Edward D. Wilford, Esq., New York, NY, Stuart David Rubin, Brooklyn, NY, Stuart J. Grossman, Grossman & Rinaldo, Forest Hills, NY, Javier A. Solano, Law Offices of Javier A. Solano PLLC, John F. Kaley, Doar Rieck & Mack, New York, NY, for Defendants.

Colleen Elizabeth Kavanagh, United States Attorney, Jack Smith, U.S. Attorney's Office, Brooklyn, NY, for Plaintiff.

## *MEMORANDUM & ORDER*

GARAUFIS, District Judge.

■ Ronell Wilson ("Defendant") was indicted on November 22, 2004 for a number of crimes related to a pattern of racketeering activity, as defined in 18 U.S.C. §§ 1961(1) and 1961(5), including multiple counts of murder in aid of racketeering, obstruction of justice murder, and causing death through the use of a firearm, as well as one count of murder resulting from a carjacking, in violation of 18 U.S.C. §§ 1111(a), 1512(a)(1)(C), 1959(a)(1), and 2119(3). Because the maximum penalty for a conviction on any of these murder charges is death, the court, pursuant to 18 U.S.C. § 3005 and 21 U.S.C. § 848(q)(4), has overseen the process of appointing so-called "learned counsel" to assist in the defense.[1]

---

1. The plain language of 18 U.S.C. § 3005 provides that learned counsel may be appoint-

For the following reasons, the court appoints Kelley Sharkey as lead learned counsel and Mitchell Dinnerstein as associate learned counsel.

## I. BACKGROUND

The indictment alleges that the Defendant, along with his four co-defendants, none of whom is charged with a capital crime, were members of a criminal organization, the Stapleton Crew, that engaged in various forms of illegal activity, including murder, attempted murder, carjacking, obstruction of justice, assault, robbery, and narcotics and firearms trafficking. (Indictment at 1). In connection with his involvement in the Stapleton Crew, the Defendant is alleged to have killed two undercover New York City Police Detectives, James Nemorin and Rodney J. Andrews, on March 10, 2003. (*Id.* at 5, 7). The alleged murders occurred during the course of an undercover firearms transaction on Staten Island. Press Release, United States Attorney's Office—Eastern District of New York, Stapleton Crew Members Indicted for Racketeering Charges Include Murder of Two Undercover Police Officers (Nov. 22, 2004) (available at http://www.usdoj.gov/usao/nye/pr/2004nov22.htm).

Charges were initially brought against the Defendant in New York State Supreme Court, Staten Island, by the Richmond County District Attorney. However, following the decision of the Court of Appeals of New York in June 2004 declaring New York's death penalty statute unconstitutional, *People v. LaValle*, 3 N.Y.3d 88, 783 N.Y.S.2d 485, 817 N.E.2d 341 (2004), the Richmond County District Attorney began working with the United States Attorney's office for the Eastern District of New York to ensure that "the

strongest possible charges and most severe penalties that could be brought" were available. *Id.; see also* Press Release, Office of the District Attorney—Richmond County, Prepared Remarks of Richmond County District Attorney Daniel M. Donovan, Jr. Regarding Federal Indictments of "Stapleton Crew" (Nov. 22, 2004) (available at http://www.rcdaoffice.org/pressreleases/pr112204.htm). This cooperation between the Richmond County District Attorney and the United States Attorney ultimately led to the filing of federal charges and the origination of this case.

During the twenty-month period before federal charges were filed and the Defendant's case was active in state court, where it remains pending, the Defendant was represented by the Capital Defender Office ("CDO"), a state-funded organization. Specifically, Deputy Capital Defender Kelley Sharkey acted as lead trial counsel and Deputy Capital Defender Mitchell Dinnerstein was associate trial counsel. (Sharkey Dec. 7, 2004 Lettr. at 3). The CDO, founded in 1995 upon the return of capital punishment in New York, has represented 151 defendants in death eligible cases, including direct representation in seven New York State capital trials. (*Id.* at 2). In fact, it was the CDO that seems to have indirectly prompted this federal prosecution through its success in overturning New York's death penalty statute in *People v. LaValle*.

Upon the Defendant's arraignment on federal charges, this court appointed Ephraim Savitt as lead trial counsel pursuant to the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A. Savitt is an experienced federal criminal defense attorney who has been appointed as learned counsel in a number of federal capital cases in this

---

ed for a defendant upon indictment of a capital crime; the government need not have announced that it will actually seek the death

penalty. *See United States v. Miranda,* 148 F.Supp.2d 292, 293 n. 1 (S.D.N.Y.2001).

district, including one tried to verdict, *United States v. Dixon*, No. 01–CR–00389 (Dearie, J.). *See also United States v. Massino*, 303 F.Supp.2d 258 (E.D.N.Y. 2003) (Garaufis, J.) (Savitt was initially appointed learned counsel but had to be replaced because of an unwaivable conflict). Following Savitt's appointment, and in response to Sharkey and Dinnerstein expressing interest in continuing to represent the Defendant, the court requested an explanation of their qualifications to serve as learned counsel. The court also began consulting with Peter Kirchheimer, Supervising Attorney of the Eastern District's Federal Defender Division, in accordance with the requirements of 18 U.S.C. § 3005.

The court has now received a number of submissions, both solicited and unsolicited, that raise a number of relevant considerations regarding the appointment of Sharkey and Dinnerstein as learned counsel.

## II. DISCUSSION

### A. The Appointment Procedure

Representing a defendant in a capital case is an extraordinary undertaking. The most obvious feature of capital defense work are the stakes involved: conviction may lead to the death of one's client. Because of the irreversible nature of this punishment, every aspect of the case is affected and the significance of every decision is amplified. It has been observed that because of these high stakes and the relatively new statutes governing the death penalty that these cases necessarily involve "more motions, more legal challenges and generally more work." Molly Treadway Johnson & Laural L. Hooper, Federal Judicial Center, *Resource Guide for Managing Capital Cases* at 3 (April 2004), http://www.fjc.gov/public/pdf.nsf/lookup/dpen0000.pdf/$file/dpen0000.pdf.

Capital cases also involve special procedural aspects. Unlike a typical criminal case, where the nature of the punishment only becomes an issue after conviction at sentencing, a capital case involves a number of stages during which counsel has the opportunity to secure substantial relief for a client. Before even proceeding to trial, defense counsel in federal capital cases may argue before a committee appointed by the Attorney General that the Department of Justice should not seek the death penalty. Department of Justice, *United States Attorney's Manual* § 9–10.000. If a case in which the death penalty is being sought proceeds to trial, it involves a bifurcated proceeding. First, as in a typical trial, a guilt phase takes place, and then if a conviction is secured, a penalty phase occurs in which defense counsel advocates for the jury to spare the defendant's life. Each of these stages involves extensive preparation and its own tactical considerations. *See* Subcomm. on Fed. Death Penalty Cases, Comm. on Defender Servs., Judicial Conference of the United States, *Fed. Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation* ("*Spencer Report*") at 4–11 (1998). For instance, the defense must evaluate the extent to which claims of innocence during the guilt phase, *e.g.*, an alibi defense, will impact its credibility with the jury if the trial moves to the mitigation phase. Having argued for a client's innocence, a lawyer may have difficulty credibly articulating how the circumstances of the defendant's life or of the criminal conduct charged should be taken into consideration by the jury in assessing the defendant's culpability after the jury has just rejected the defense's case with respect to guilt. *See* Johnson & Hooper, *supra*, at 2–3.

Because of the stakes involved and the unique procedural aspects of a capital proceeding, representing a capital defendant requires a great deal of technical expertise specific to capital cases that can only be

gained through firsthand experience. In recognition of this fact, 18 U.S.C. § 3005 provides that a defendant indicted for a capital crime is entitled to representation by two court-appointed attorneys, "of whom at least 1 shall be learned in the law applicable to capital cases." [2] The *Spencer Report* describes "learned counsel" as counsel with:

> distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in *state* death penalty trial, appeals, or post-conviction review that, in combination with co-counsel, will assure high quality representation.

*Spencer Report* Recommendation 1(b) (emphasis in original). Underscoring the importance of experience in learned counsel, the commentary accompanying the Recommendation suggests that:

> [t]he preparation of a death penalty case for trial requires knowledge, skills and abilities which are absent in even the most seasoned felony trial lawyers, if they lack capital experience. An attorney knowledgeable about the nature of capital pretrial litigation, the scope of a mitigation investigation and the impact of the sentencing process on the guilt phase is indispensable and generally produces cost efficiencies.

As the Federal Defender succinctly expressed to the court: "For learned counsel, capital trial experience is the *sine qua non* of our search." (Kirchheimer Feb. 2, 2005 Lttr. at 1).

A capital case is extremely demanding to defend because of the effort and pressure involved. A study comparing the number of hours billed for non-capital homicide cases compared to those cases in which the death penalty was authorized puts these demands in stark terms: the non-capital cases involved an average of 117 hours billed, while the capital cases required an average of 1,464 hours of work. Phillip J. Cook & Donna B. Slawson, *The Cost of Processing Murder Cases in North Carolina* (1993), *cited in Spencer Report* at 6. Thus assessing potential learned counsel's level of commitment and eagerness to take on a defendant are crucial concerns; a court must be satisfied that counsel understands the magnitude of the task being undertaken and has the ability to provide unflagging effort. *See* Johnson & Hooper, *supra*, at 7 (citing 7 Guide to Judiciary Policies and Procedures, ch. VI, ¶ 6.01(B)(1)(a)-(e)).

Given these exacting qualifications and the demanding nature of the representation, there are relatively few members of the bar who are suitable for appointment. In fact, this court has experienced the difficulty of finding counsel qualified to try death eligible cases. *See United States v. Massino*, 302 F.Supp.2d 1, 2 (E.D.N.Y. 2003) (Garaufis, J.) ("the court has become aware of the limited availability of attorneys qualified to serve as learned counsel in federal death penalty cases"). Based on the frequency with which death is sought as a penalty in the federal system, this problem is likely to remain a significant obstacle to courts faced with the task of appointing learned counsel, and more critically to those defendants facing the possibility of execution. Indeed, President George W. Bush recently addressed this issue when he spoke of the pressing need "to fund special training for defense counsel in capital cases, because people on trial for their lives must have competent lawyers by their side." George W. Bush, State of the Union Address (Feb. 2, 2005)

---

**2.** A court has the discretion to appoint more than two attorneys. 18 U.S.C. § 848(q)(4) (a defendant in a capital case "shall be entitled to the appointment of *one or more attorneys* ") (emphasis added).

(transcript available at http://www.white-house.gov/news/releases /2005/02/20050202–11.html).

In making the decision about the appointment of learned counsel, the court had available a variety of sources for information and advice. Under 18 U.S.C. § 3005, the court is directed to "consider the recommendation of the Federal Public Defender organization." The court also received valuable guidance from Kevin McNally of the Federal Death Penalty Resource Counsel. *See* Johnson & Hooper, *supra*, at 7 ("Federal Death Penalty Resource Counsel (FDPRC), under an arrangement with the Defender Services Division of the Administrative Office, are available to assist federal judges in identifying qualified counsel to appoint."). In order to better assess whether there might be any impediment to the appointment of Sharkey and Dinnerstein based on federal law, the court received a submission from the United States Attorney's office. Sharkey and Dinnerstein also provided the court with letters outlining their capital experience, the work they have already completed in this case, and their desire to continue their representation of the Defendant. Finally, the court consulted Savitt regarding his potential co-counsel, with particular focus on forming a defense team that would be able to work effectively together and have the requisite blend of skills and experience to mount a vigorous defense.

### B. The Appointment Decision

■ Having considered the substantial amount of information received during this process, the court concludes that Sharkey and Dinnerstein are the most qualified and appropriate attorneys to serve as learned counsel. The court wishes to make clear that it is appointing Sharkey and Dinnerstein in their individual capacities and that their appointment is not tantamount to enlisting the entire CDO organization to assist in the defense. As with any other CJA case, all proposed additional expenditures must first be submitted to the court for approval, including those for the work performed by any other CDO personnel. However, given the seriousness of the charges and the complexity of this case, the defense team will naturally be granted significant latitude in expending resources to conduct its investigation and mount its defense.

The decision to appoint Sharkey and Dinnerstein is based on two principal factors: (1) the substantial experience that they have acquired in conducting capital litigation; and (2) the extensive amount of work they have already done preparing a defense during the 20 months they represented the Defendant in state court proceedings, including developing an apparently strong working relationship with Wilson and his family. While the importance of these factors may be self-evident, the court places great significance on the advice of Peter Kirchheimer of the Eastern District's Federal Defender Division, who emphasized that these criteria, above all others, should guide the court's decision. (*See* Kirchheimer Feb. 4, 2005 Lttr.). Kircheimer was unequivocal in urging that Sharkey and Dinnerstein are the attorneys best suited to fulfill these requirements and represent the Defendant.

### 1. Sharkey and Dinnerstein's Qualifications

Sharkey has substantial capital trial experience and an obvious commitment to the work that makes her well suited for appointment as lead learned counsel. Employed by the CDO since its inception in 1995, Sharkey has been lead counsel in 27 death-eligible cases. (Sharkey Dec. 7, 2004 Lttr. at 3). More importantly for this case, Sharkey has tried two capital cases

to verdict. (*Id.*). The fact that her capital experience occurred in state court instead of federal is of no moment. Because the jury's consideration of relevant mitigating evidence in a capital case is constitutionally required under the Eighth and Fourteenth Amendments, *see Lockett v. Ohio,* 438 U.S. 586, 604–5, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and because the stakes involved are the same regardless of the courthouse, state and federal capital cases share fundamental similarities. The value of state capital representation is acknowledged in the *Spencer Report's* recommendation for the qualifications of learned counsel. "[D]istinguished prior experience in state death penalty trials, appeals, or post-conviction review" is placed on equal footing alongside "distinguished prior experience" in federal representation as the primary factor for selecting learned counsel. *Spencer Report* Recommendation 1(b). In fact, Kevin McNally of the Federal Death Penalty Counsel indicates that based on his organization's fourteen years experience in recommending learned counsel, "[i]t has long been our belief that the ideal federal capital trial defense team is the combination of an experienced federal criminal practitioner and an experienced state capital trial lawyer." (McNally Feb. 1, 2005 Lttr. at 1, Ex. A to Kircheimer Feb. 2, 2005 Lttr.) Finally, in addition to her firsthand state trial experience, Sharkey has received training in both federal criminal capital work and federal criminal representation generally. (Sharkey Dec. 7, 2004 Lttr. at 3).

Dinnerstein has also been employed by the CDO since 1995 and during that time he has represented 34 clients in death-eligible cases along with consulting on 95 other cases. (*Id.*). He has tried one capital case, along with two noncapital first-degree murder cases, to verdict. (*Id.*). Further, like Sharkey, his chosen employment bespeaks an unquestionable commitment to undertaking representation such as this one. Although Dinnerstein has less capital trial experience than Sharkey, he is well qualified to serve as associate learned counsel. Given the seriousness of the charges involved in this case and the public scrutiny that it has and will continue to receive, factors which serve to complicate procedural aspects like jury selection, the court deems appointing Dinnerstein a necessary additional step in ensuring an adequate defense for the Defendant. *See* 21 U.S.C. § 848(q)(4). Dinnerstein's involvement in this trial will also have the desirable effect of expanding the size of the available federal defense bar for future cases. *See Massino,* 302 F.Supp.2d at 2–3.

In addition to possessing excellent capital experience, Sharkey and Dinnerstein offer the distinctive advantage of having represented the Defendant for some 20 months in state court proceedings. This prior state representation presents numerous benefits for their continued involvement in the federal case. The most significant of these may be the fact that they have had the opportunity to form a relationship with both the Defendant and his family. All defendants play some role in their defense, but in capital cases, where preparing a mitigation case often involves a difficult examination of the defendant's past, a defendant's trust and confidence in his representation may be particularly critical. Additionally, as Savitt observes in his letter to the court, the strong relationship that Sharkey in particular has developed with the Defendant will aid Savitt in forming his own relationship with the Defendant, which will be essential for trial preparation.

Sharkey and Dinnerstein have also made substantial efforts at building a case for the Defendant. Their efforts include conducting investigations for both the guilt and penalty phases and analyzing, indexing, and digesting thousands of pages of

discovery and mitigation records. (Sharkey Dec. 7, 2004 Lttr. at 1). Savitt notes that Sharkey has "encyclopedic familiarity with the facts of the case" and suggests that their disqualification "will inevitably delay and hinder defense preparations at best, and possibly cripple such efforts to the detriment of Mr. Wilson." (Savitt Feb. 1, 2005 Lttr. at 1). The benefit of previous experience in this case is underscored by the government's decision to cross-designate Richmond County Assistant District Attorneys to assist the federal prosecution as Special Assistant United States Attorneys. *See* Press Release, Office of the District Attorney—Richmond County, *supra.*

### 2. Savitt's Endorsement

As is clear from the discussion above, Savitt has strongly endorsed the appointment of Sharkey and Dinnerstein. Like the court, he favors their involvement because of their capital experience and because of the extensive work they have already undertaken in the case. Savitt's endorsement of Sharkey and Dinnerstein carries great weight with the court because of the importance of assuring that the defense team can function well together in what will undoubtedly be a challenging case. Since Savitt has been working with Sharkey and Dinnerstein from the inception of the federal case, he speaks from experience. Savitt has also assured the court that he will apply his previous experience as learned counsel to the case and "assume responsibility" for assisting Sharkey in navigating the federal procedures that will be relevant to her duties as lead learned counsel. (Savitt Feb. 1, 2005 Lttr. at 2). Along with the other compelling reasons justifying their appointment, the court's desire not to disturb what is clearly a well-functioning defense team mi-litates in favor of appointing Sharkey and Dinnerstein.

### 3. The Government's Opposition

In two letters submitted to the court, the government objects to the appointment of Sharkey and Dinnerstein based on both federal and state considerations. The court finds the government's objections to be without merit because the government presents no plausible federal concern that would bar the appointment of Sharkey and Dinnerstein. The government merely contends that federal reimbursement of the CDO is inappropriate because it would burden the CJA budget and also because the CDO has not properly explained why its staff would need federal reimbursement when they are state-salaried employees. However, as discussed above, the court is appointing Sharkey and Dinnerstein individually and not the CDO as a whole. Nothing about such individual appointments threaten to burden the CJA budget. In fact, the large amount of work already done on this case by Sharkey and Dinnerstein will benefit the federal treasury by avoiding the costs of duplicative trial preparation and requiring new counsel to get up to speed on the case. However, the potential savings afforded the federal treasury are not a significant consideration in reaching a decision which may affect the very life of an individual. The court will direct that payment be made to Sharkey and Dinnerstein individually at the CJA rate of $125 per hour for lead learned counsel and at the reduced rate of $90 per hour as associate learned counsel, respectively.[3] How CJA payments affect either Sharkey or Dinnerstein as CDO employees or the state agency for which they work is simply not a problem that a federal court should consider or accommodate in making a critical decision regarding the effective-

---

**3.** Sharkey proposed these hourly rates in her December 7, 2004 letter to the court.

ness of a capital defendant's representation.

The government also raises the possibility of a post-conviction appeal for ineffective assistance of counsel as another reason cutting against the appointment of Sharkey and Dinnerstein. Raising such an issue as an additional factor for consideration now is somewhat puzzling inasmuch as this entire exercise has been directed at protecting the Defendant's right to effective assistance of counsel under the Sixth Amendment. Thus the issue of appeal as a separate concern seems to be beside the point. In any event, if the issue of the viability of the Defendant's appeal were to factor directly into the court's consideration, it would work in precisely the opposite manner than that advanced by the government. To appoint counsel other than Sharkey and Dinnerstein would require the court to both reject the unambiguous advice of the Federal Defender, which the court is obligated to consider under 18 U.S.C. § 3005, and to tear apart an attorney-client relationship of more than 20 months. Such a decision would create a much better issue for appeal than the appointment of Sharkey and Dinnerstein. That Sharkey and Dinnerstein's capital experience comes from state court, which, it bears repeating, is regarded by the leading authorities on this subject as sufficient preparation for federal representation as learned counsel, is definitely not a disqualifying consideration. Furthermore, the court's acquiescence to the government's request in the absence of a compelling federal justification for doing so would create the unseemly appearance that the government was playing a significant role in choosing the representation for someone it is prosecuting. Surely the apparent impropriety of such a situation would create a compelling issue for the appellate courts to consider.

The government also argues that state law precludes the participation of lawyers from the CDO in a federal case. Specifically, it argues that under New York Judiciary Law § 35–b(4) the CDO's representation of the Defendant in federal court would exceed its authority. The government cites the undocumented opinion of Roger McDonough, Assistant Counsel to the Governor of New York State, in support of this proposition, but provides no explanation as to why he reached this conclusion, only that his office "examined the relevant statutes."[4] (Kavanagh Jan. 24 Lttr. at 1–2). This line of argument is without merit. First, as mentioned above, the mechanics of a state agency and its compliance with state law are not the province of a federal court in this situation. Second, the government's argument misapprehends the relevant state law as it relates to the situation at hand. As Sharkey points out in her February 1, 2005 letter to the court, both the government and the Governor's Assistant Counsel overlook New York Judiciary Law 35–b(4)(b)(i), which authorizes CDO attorneys, in addition to performing capital representation in New York State cases, to provide such "reasonably necessary services as the capital defender deems appropriate." Since the Capital Defender, Kevin M. Doyle, has determined that the continued

---

4. In addition to the fact that the Assistant Counsel's opinion is offered without meaningful explanation, the court observes that it is the Attorney General who has responsibility for overseeing legal issues relating to state agencies not the Governor's Counsel. *See* N.Y. Exec. Law § 63(1) (the Attorney General shall have "charge and control of all the legal business of the departments and bureaus of the state, or of any office thereof which requires the services of attorney or counsel, in order to protect the interest of the state"). Thus the court deems Mr. McDonough's intrusion into an ongoing federal case as entirely unwarranted.

representation of the Defendant by CDO attorneys in his federal case is "reasonably necessary," the matter is resolved. (Sharkey Feb. 1, 2005 Lttr. at 1).

## III. CONCLUSION

For the foregoing reasons, the court hereby appoints Kelley Sharkey and Mitchell Dinnerstein to serve as lead learned counsel and associate learned counsel, respectively, for Ronell Wilson.

SO ORDERED.